# PETER J. DUNNE

*v.*

# THE PEOPLE OF THE STATE OF ILLINOIS.

1. JUROR—*exemption of active militia.* The provision of the act of May 28, 1879, entitled "An act to provide for the organization of the State militia," etc., which exempts an active member of a company of the State militia from serving upon juries, is a valid and constitutional law.

2. STATE MILITIA—*State and Federal power—and herein, of their concurrent powers.* The power in Congress to provide for organizing, arming, equipping and disciplining the militia, is not exclusive. It is merely an affirmative power, and not incompatible with the existence of a like power in the States; and hence the States have concurrent power of legislation not inconsistent with that of Congress. It is only repugnant and interfering State legislation that must give way to the paramount laws of Congress constitutionally enacted.

3. The Federal constitution does not confer on Congress unlimited power over the militia of the several States, but it is restricted to specific objects enumerated, and for all other purposes the militia of the States remains subject to State legislation. The power of a State over its militia is not derived from the constitution of the United States. It is a power the States had before the adoption of that instrument, and its exercise by the States not being prohibited by it, it still remains with the States, subject only to the paramount authority of acts of Congress enacted in pursuance of the constitution.

4. The reservation to the States of the power of appointing the officers of the militia, and authority to train the militia according to the discipline prescribed by Congress, does not place any restriction upon the States in respect of its power of concurrent legislation concerning its militia. The exception from a given power can not be considered as an enumeration of all the powers which belong to the States over the militia.

5. There is no question of the power of a State to organize such portion of its militia as may be deemed necessary in the execution of its laws, and to aid in maintaining domestic tranquillity within its borders. The power given to the chief executive of the State to call out the militia to execute the laws, etc., by implication recognizes the right to organize a State militia.

6. By any fair construction of the constitution of the United States, a law to organize the militia of a State for its own purposes, not inconsistent with the laws of Congress on that subject, is valid. In right of its sovereignty a State may employ its militia to preserve order within its borders, where the ordinary local officers are unable, on account of the magnitude of the disturbance, or any sudden uprising, to accomplish the result.

7.  The organization of the active militia of the State is not in violation of that clause of the Federal constitution which withholds from the States the right to keep troops in time of peace.  Such a militia is not embraced in the term "*troops*," as used in the constitution.  The State militia is simply a domestic force, as distinguished from regular troops, and is only liable to be called into service when the exigencies of the State make it necessary.

8.  It is a matter dependent on the wisdom of Congress whether it will provide for arming and disciplining the entire body of the militia of the United States.  The citizen is not entitled, under any law, State or Federal, to demand, as a matter of right, that arms shall be placed in his hands.

9.  It is for the legislature to determine of what number the active militia of the State shall consist, depending on the exigency that makes such organization necessary.

10.  SAME—*validity of act of* 1879—*under constitution of* 1870, *and in respect to Federal laws.*  The act of the General Assembly of May 28, 1879, providing for the organization of a State militia, etc., is not in conflict with any provision of the present constitution of this State.

11.  Nor is that act repugnant to the national law relating to the militia, either in its spirit, intent or effect.  In defining what persons shall constitute the State militia, it is in strict accordance with the act of Congress of 1792.

12.  The provision in the State militia law making it the duty of the Governor, as commander-in-chief, by proclamation, to require the enrollment of the entire militia of the State, or such portion thereof as shall be necessary, in the opinion of the President of the United States, and to appoint enrolling officers, and to make all necessary orders to aid in the organization of the militia, is not in contravention of any of the provisions of the act of Congress of 1792, or any other act of Congress in relation to the organization of the militia, but is rather in aid of such laws.

13.  The organization of a State militia, when not in actual service, but for the purpose of training under the act of Congress, into divisions, brigades, regiments, battalions and companies, shall be done as the State legislature may direct.  When called into the national service, it is made the duty of the executive to organize the militia as the act of Congress directs.

14.  The adoption of the discipline, exercises and equipment required in the regular army of the United States, in the State system, will not render the law invalid.

15.  The fact that the men composing the active militia of the State are required to take an oath to obey the "orders of the commander-in-chief, and such other officers as may be placed over them," is no just ground of objection to the law.  The obedience to the orders of the Governor is when they are in the service of the State, and not in the actual service of the United States.

16. The provision of the Militia Code of the State, which provides that no military company shall leave the State with arms and equipments without the consent of the commander-in-chief, was intended to apply to the militia when not in the actual service of the United States, and is a valid law.

17. The provision of the militia law making it unlawful for any body of men other than the regularly organized volunteer militia of this State and of troops of the United States, with an exception in favor of students in educational institutions where military science is taught, to associate themselves together as a military company or organization, or to drill or parade with arms, in any city or town of this State, without the license of the Governor, is not inconsistent with any paramount law of the United States, and is a binding law.

18. Same—*the act not defeated if some provisions are invalid.* If the militia law, in some minor matters of detail in the organization of the active militia, or in some of its regulations, should not be found in harmony with the acts of Congress, that would not invalidate the whole act. The most that can be said is, that they should yield to the paramount laws of the United States.

19. If the general provisions in sections 4, 5 and 6, of article 11 of the Militia act, were repugnant to the laws of the United States respecting the militia, they might be eliminated from the statute without affecting in the slightest degree the efficient organization of the active militia; but they are not inconsistent with or repugnant to any acts of Congress on the subject.

20. Non-essential differences in the regulations as to the militia not in the actual service of the United States, contained in a State law, from those in acts of Congress, will not render the former invalid.

21. Police power of the State—*generally.* In matters pertaining to the internal peace and well-being of the State, its police powers are plenary and inalienable. It is a power co-extensive with self-protection. Everything necessary for the protection, safety and best interests of the people of the State, may be done under this power. Persons and property may be subjected to all reasonable restraints and burdens for the common good.

22. Where mere property interests are involved, this power, like other powers of government, is subject to constitutional limitations; but when the internal peace and health of the people are concerned, the only limitations imposed are, that such "regulations must have reference to the comfort, safety and welfare of society." What will endanger the public security must, as a general rule, be left to the wisdom of the legislative department.

23. Same—*prohibiting parade, etc., of armed bodies of men.* It is a matter within the regulation and subject to the police power of the State to determine whether bodies of men, with military organizations or otherwise, under no discipline or command by the United States or of this State, shall be permitted to parade with arms in populous communities and in public places.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM H. BARNUM, Judge, presiding.

Mr. CHARLES A. GREGORY, for the plaintiff in error.

Mr. LYMAN TRUMBULL, Mr. HARRY REUBENS, and Mr. WOLFORD N. LOW, for the defendants in error.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

Peter J. Dunne, having been summoned to serve as a jury-man in the Criminal Court of Cook county, at the September term, 1879, it was made to appear he was a citizen of Illinois, twenty-two years of age, and that he was an enlisted, active member of the "Illinois National Guard," in Company G, First Regiment, a military company organized and existing under a statute of this State, approved May 28, 1879, and in force July 1, of the same year, entitled "An act to provide for the organization of the State militia, and entitled the Military Code of Illinois," and because of the facts appearing he claimed, under the provisions of the act, which so expressly declares, he was exempt from jury duty, but the court deemed the cause assigned insufficient in law to excuse the juror from service, and notwithstanding the decision of the court he refused to serve in the capacity of a juror, and on account of his contumacy he was fined in the sum of $50.

Acting on the suggestion of counsel, that it is the desire of both parties to obtain the opinion of this court as to the validity of the act of the General Assembly "to provide for the organization of the State militia," approved May 28, 1879, all preliminary considerations as to the manner in which the case comes before the court, and the invalidity of the act under the constitution of the State, will be waived with a view to proceed directly to the question whether the act, or such parts of it as provide for the organization of the active militia of the State, known as the "Illinois National Guard," is void by reason of its repugnancy to the constitution of the

United States, and to the laws passed in pursuance thereof. It may be remarked, although no point is made that the act in question contravenes any provision of our State constitution, it seems to be in entire harmony with that instrument. Article 12, section 1, constitution of 1870, is, " The militia of the State of Illinois shall consist of all able bodied male persons resident in the State between the ages of eighteen and forty-five, except such persons as now are or hereafter may be exempted by the laws of the United States or of this State." And section 2 of the same article is, " The General Assembly, in providing for the organization, equipment and discipline of the militia, shall conform as nearly as practicable to the regulations for the government of the armies of the United States." On examination it will be seen the act of the General Assembly under consideration conforms exactly with these constitutional requirements, as will be made to appear more fully in the sequel of this discussion.

If, therefore, this act of the legislature is void, it must be for one of two reasons assigned : 1. Because of its repugnancy to the constitution of the United States; or, 2. Because it is inconsistent with and repugnant to the acts of Congress on the same subject, passed in pursuance with authority conferred by the Federal constitution. The importance of the questions involved has induced the most careful consideration, but it will be our purpose to avoid all unnecessary discussion and state our views as briefly as practicable.

The first proposition submitted against the validity of the act known as the " Military Code," is that the power of organizing, arming and disciplining the militia, being confined by the constitution of the United States to Congress, when Congress has acted upon the subject and passed a law to carry into effect the constitutional provision, such action excludes the power of legislation by the State on the same subject. This is not, in our judgment, an accurate—certainly not a full expression of the law. Two things must be assumed to maintain this proposition : 1. That the constitutional pro-

vision in respect to the militia is of that character it can only be exercised by Congress, and that any State legislation would of necessity be inconsistent with Federal legislation under that article of the constitution. 2. That the constitution itself places a restriction, either directly or by implication, upon all State legislation in respect to the militia. Neither assumption is warranted by any fair construction of the constitution of the United States, nor by contemporaneous explanations by writers whose authority is to be respected, or by any subsequent judicial determinations with which we are familiar.

Article 1, section 8, division 15, confers power on Congress "to provide for organizing, arming and disciplining the militia, and for *governing* such part of them as may be employed in the service of the United States, reserving to the States respectively the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress." Neither this clause nor any other of the constitution inhibits in express terms State legislation in regard to the militia. Our understanding is, it is a matter upon which there may be concurrent legislation by the States and Congress. No doubt it is true that some powers granted to Congress are exclusive, and exclude by implication all State legislation in regard to the subject of such powers. It is not true, however, that all powers granted to Congress are exclusive, unless where concurrent authority is reserved to the States. Examples of concurrent authority readily suggest themselves. Congress has power, under the constitution, "to lay and collect taxes, duties, imposts and excises," but it has never been supposed that grant of power was a restriction upon the States. "to lay and collect taxes" for State purposes. Such a construction would destroy all State governments by taking from them the means of maintaining order or protecting life or property within their jurisdictions. Other examples might be mentioned, but this is sufficient for our present purpose.

It might be well in this connection to call to mind that
"powers not delegated to the United States by the constitu-
tion, nor prohibited by it to the States, are reserved to the
States respectively, or to the people." The power of State
governments to legislate concerning the militia, existed and
was exercised before the adoption of the constitution of the
United States, and as its exercise was not prohibited by that
instrument, it is understood to remain with the States, sub-
ject only to the paramount authority of acts of Congress
enacted in pursuance of the constitution of the United States.
The section of the constitution cited does not confer on Con-
gress unlimited power over the militia of the States. It is
restricted to specific objects enumerated, and for all other
purposes the militia remain as before the formation of the
constitution, subject to State authorities. Nor is there any
warrant for the proposition that the authority a State may
exercise over its own militia is derived from the constitution
of the United States. The States always assumed to control
their militia, and, except so far as they have conferred upon
the national government exclusive or concurrent authority,
the States retain the residue of authority over the militia
they previously had and exercised. And no reason exists
why a State may not control its own militia within constitu-
tional limitations. Its exercise by the States is simply a
means of self-protection.

The States are forbidden to keep "troops" in time of peace,
and of what avail is the militia to maintain order and to
enforce the laws in the States unless it is organized. "A well-
regulated militia" is declared to be "necessary to the security
of a free State." The militia is the dormant force upon
which both the National and State governments rely "to exe-
cute the laws, * * * suppress insurrections and repel
invasions." It would seem to be indispensable there should
be concurrent control over the militia in both governments
within the limitations imposed by the constitution. Accord-
ingly, it is laid down by text writers and courts that the

power given to Congress to provide for organizing, arming
and disciplining the militia is not exclusive. It is defined to
be merely an affirmative power, and not incompatible with
the existence of a like power in the States; and hence, the
conclusion is, the power of concurrent legislation over the
militia exists in the several States with the national govern-
ment.

The case of *Houston* v. *Moore*, 5 Wheaton, 1, is an au-
thority for this construction of the constitution. The ques-
tion before the court in that case, as concisely stated by Kent,
in his Commentaries, in discussing the power of Congress
over the militia, was, whether "it was competent for a court-
martial, deriving its jurisdiction under State authority, to try
and punish militiamen, drafted, detached and called for by
the President into the service of the United States, who re-
fused and neglected to obey the call;" or, as stated by STORY,
J., the only question cognizable by the court on the record
before them arose on the refusal of the "State Court of
Common Pleas to instruct the jury that the first, second and
third paragraphs of the 21st section of the statute of Penn-
sylvania of the 28th of March, 1814, as far as they related to
the militia called into the service of the United States under
the laws of Congress, and who failed to obey the orders of
the President of the United States, are contrary to the consti-
tution of the United States and the laws of Congress made
in pursuance thereof, and are, therefore, null and void. The
court instructed the jury that those paragraphs were not con-
trary to the constitution or laws of the United States, and
were, therefore, not null and void." Notwithstanding there
was a law of Congress that provided for the organization of
courts-martial for the trial of militia, drafted, detached, called
forth into the service of the United States, to be conducted as
courts-martial for the trial of delinquents in the army, the
court decided that the militia, when called into the service of
the United States, were not to be considered in that service or
in the character of national militia, until they were mustered at

the place of rendezvous; and until then the State retained a right, concurrent with the government of the United States, to punish their delinquency. The statute that formed the ground of controversy in the State court enacted that non-commissioned officers and privates in the militia who should neglect or refuse to serve when called into the actual service of the United States, in pursuance of an order or requisition of the President, should be liable to certain penalties, defined in the act of Congress of 1795. The judges concurring in the decision of the court did not concur in all the reasoning by which the conclusion was reached, and they seem to have coincided only in the decision the State law was valid. WASHINGTON, J., delivered the principal opinion. JOHNSON, J., gave a concurring opinion, and STORY, J., delivered a dissenting opinion, in which another member of the court concurred.

Although neither opinion had the sanction of a majority of the court as to all it contains, yet on many subjects discussed the judges all agreed, and as the several opinions contain the views of these eminent legists on these important questions, they are entitled to the highest consideration. After stating his conclusion that the offence of disobedience to the President's call upon the militia is not exclusively cognizable before courts-martial of the United States, WASHINGTON, J., adds: "It follows then, as I conceive, that jurisdiction over this offence remains to be concurrently exercised by the National and State courts-martial, since it is authorized by the laws of the State and not prohibited by those of the United States." There being no repugnance in the State law with the law of Congress, in his opinion, the conclusion he reached, after an extended examination of the case, was, the State court-martial had a concurrent jurisdiction with the tribunal pointed out by the act of Congress to try a militiaman who had disobeyed the call of the President, and to enforce the laws of Congress against such delinquent.

JOHNSON, J., conceded fully that concurrent power of legislation over the militia existed in the States with the National government. STORY, J., in the opinion he gave, was even more pronounced in the expression of similar views, and, in speaking of the power granted to Congress by the constitution to call forth the militia to execute the laws of the Union, and to organize, arm and discipline the same, said, "It is almost too plain for argument, that the power here granted to Congress over the militia is of a limited nature, and confined to the objects specified in these clauses, and that in all other respects and for all other purposes the militia are subject to the control and government of the State authorities." All the judges concurred, as we understand their opinions, in the proposition that, when Congress has once acted within the limits of the power granted in the constitution, its laws for organizing, arming and disciplining the militia are supreme, and all interfering regulations adopted by the States are thenceforth suspended, and for the same reasons all repugnant legislation is unconstitutional. That principle applies only where Congress has assumed control of the militia under granted powers, and does not militate against the construction uniformly given to the constitution by Kent and other writers, "that a State may organize and discipline its own militia, in the absence of or subordinate to the regulations of Congress." It is only repugnant and interfering State legislation that must give way to the paramount laws of Congress constitutionally enacted. The cases that support this doctrine are numerous and of the highest authority. *Houston* v. *Moore,* 5 Wheaton, 1; *Sturgis* v. *Crowenshield,* 4 id. *122; *Livingston* v. *Van Ingen,* 9 Johns. 507; *Houston* v. *Moore,* 3 Ser. & Rawle, 170*; *Opinion of the Justices,* 14 Gray, 614; *Gilman* v. *Philadelphia,* 3 Wall. 713; *United States* v. *Cruikshank,* 92 U. S. R. 542; *Blanchard* v. *Russell,* 13 Mass. 1; *Caldee* v. *Bull,* 3 Dallas, 386; 1 Kent's Com. 265, 389. No case has been cited that holds a contrary doctrine, except *Golden* v. *Prince,* 3 Wash. C. C. R. 313, and what was said

by the same judge in *Houston* v. *Moore, supra.* We are not aware that the opposite views expressed by Judge Washington in either of those cases have ever been followed by any court. In *Houston* v. *Moore,* Johnson, J., expressly controverts the proposition, "that within the scope Congress may legislate, the States may not legislate," and speaks of it as an exploded doctrine.

Nor do we think the reservation of the power "to the States, respectively, the appointment of the officers and the authority to train the militia according to the discipline prescribed by Congress," as suggested by counsel, puts any restriction upon the States in respect to the concurrent legislation concerning the militia. Mr. Justice Story, in speaking of that clause of the constitution, says "that reservation constitutes an exception merely from the power given to Congress to provide for organizing, arming and disciplining the militia, and is a limitation upon the authority which would otherwise have devolved upon it as to the appointment of officers." Obviously, that is all that clause of the constitution does mean, and we adopt as our own view what that able jurist added: "the exception from a given power can not, upon any fair reasoning, be considered as an enumeration of all the powers which belong to the States over the militia."

But the principal argument is made on the other branch of the case, viz: that the act of the General Assembly "to provide for the organization of the State militia" is repugnant to the laws of Congress on the same subject constitutionally enacted, and is for that reason null and void. Wherein the "spirit, intent and effect of the Illinois statute is in conflict with the provisions of the act of Congress," as insisted on the argument, is not apparent. Neither in the title of the act nor in any of its provisions does it appear the object of the State law is in conflict with the National law. The first section declares, "that all able-bodied male citizens of this State, between the ages of eighteen and forty-five years, except such as are expressly exempted by the laws of the United

States, or are State or county officers, or on account of their profession or employment are exempted by the commander-in-chief, shall be subject to military duty and designated as the 'Illinois State Militia.'" That is in exact conformity with the act of Congress of 1792, and what more could the legislature do? The contention of counsel is, that an act of the State legislature to organize the militia, if in conformity with the act of Congress on that subject, "is inoperative and amounts to nothing," and if it differs from the act of Congress, it is "equally inoperative and void." Assuming that to be a correct proposition,—and if it is confined to the organization and arming of the militia called to enter the active service of the United States, it is the law, then the act of the legislature is as comprehensive as it could constitutionally be made, so far as it purports to declare who shall constitute the whole body of the militia under the act of Congress.

The second section is a declaration of legislative intention on the part of the State to co-operate with the general government in the matter of enrolling and organizing the entire militia of the State when it shall become necessary "to execute the laws, suppress insurrection or repel invasions or quell riots, or when a requisition shall be made by the President of the United States for troops," and should be read in the light of facts historically known to all. For many years after the adoption of the Federal constitution, State laws provided for enrolling and training of the militia in conformity with the act of Congress. It was usual to have annual, and in some States more frequent, days for drilling and training, and persons liable to military duty were compelled to attend under penalties; but for a third of a century or more there has been very little effort, if any, made to organize and train the entire body of the militia, and all State laws designed to effectuate that purpose have either been repealed or suffered to fall into disuse. It has become the settled conviction in the public mind that militia training, as it was practiced in the States, was of no practical utility. Besides that, it would be a most

gigantic and expensive undertaking to enroll and supply the entire militia of the United States with arms and ammunition, as provided in the act of 1792. The annual appropriation of the sum named in that act for that purpose is insignificant as compared with the amount it would necessarily cost. As the laws now are, it is improbable the entire militia of the States will ever be enrolled or summoned for discipline under the act of Congress, unless some great impending danger shall make it necessary. When such an exigency does occur, this statute makes it the duty of the Governor, as commander-in-chief, by proclamation, to require the enrollment of the entire militia of the State, or such portion thereof as shall be necessary in the opinion of the President, and to appoint enrolling officers and to make all orders necessary to aid in the organization of the militia. Such a law is not in contravention of the act of 1792 or with any other act of Congress in relation to the organization of the militia, but is rather in aid of all such laws.

The remaining sections of the act, with the exception of those contained in article 11, relate to organization, arming, drilling and maintaining the "active militia" of the State. The designation "Illinois National Guard," applied to the active militia, is a matter of no consequence, and the act will be construed as though it did not contain those words. That a State may organize such portions of its militia as may be deemed necessary in the execution of its laws and to aid in maintaining domestic tranquillity within its borders, is a proposition so nearly self-evident that it need not be elaborated at any great length. "A well regulated militia being necessary to the security of a free State," the States, by an amendment to the constitution, have imposed a restriction that Congress shall not infringe the right of the "people to keep and bear arms." The chief executive officer of the State is given power by the constitution to call out the militia "to execute the laws, suppress insurrection and repel invasion." This would be a mere barren grant of power unless the State

had power to organize its own militia for its own purposes.
Unorganized, the militia would be of no practical aid to the
executive in maintaining order and in protecting life and
property within the limits of the State. These are duties
that devolve on the State, and unless these rights are secured
to the citizen, of what worth is the State government? Fail-
ing in this respect it would fail in its chief purpose. But
what reason is there why a State may not organize its own
militia for its own purposes? As we have seen, the State has
the power of concurrent legislation with the national govern-
ment over the militia, when not in the actual service of the
United States, within limits quite accurately defined in law as
well as in the decisions of courts, both State and Federal.
Certainly Congress has not exclusive jurisdiction over the
militia not actually employed in its service. Congress may
provide for "organizing, arming and disciplining" the militia,
but the appointment of officers and the authority to train the
militia according to the discipline prescribed by Congress is
reserved to the States. There can, therefore, be no efficient
organization of the militia when not called into the service of
the Union, without the co-operative aid of the States. Con-
gress may not deem it necessary to exercise all the authority
with which it is clothed by the constitution over the militia.
Historically we know there has been no efficient organization
of the militia in this State within the last thirty or forty
years.

Mr. STORY, in the opinion he gave in *Houston* v. *Moore,*
said: "It would certainly seem reasonable that in the
absence of all interfering provisions by Congress on the sub-
ject, the States should have the authority to organize, arm
and discipline their own militia. The general authority
retained by them over the militia would seem to draw
after it these necessary incidents." These were but an ex-
pression of his individual views, but anything written by
that eminent jurist on this subject is entitled to great consid-
eration, and as his views are an accurate expression of our

understanding of the meaning of the constitution in this respect, we adopt them as our own.

JUDGE WASHINGTON, in the opinion he gave in *Houston* v. *Moore,* conceded that if Congress did not exercise the power of providing for organizing, arming and disciplining the militia it was competent for the States to do it.

GIBSON, J., in the opinion he delivered in *Houston* v. *Moore,* 3 Ser. & Rawle, 192*, said: "It can not be questioned but that the Federal and State governments have concurrent authority over the militia when not in actual service of the United States. Congress has power to organize and arm,—a State may do the same. The government of the Union may draw out the militia in any of the exigencies mentioned in the constitution. A State may employ its own militia for its own purposes."

In the opinion of the justices, 14 Gray, 614, after announcing their conclusion that the commonwealth could not constitutionally provide for the enrollment in the militia of any person other than those enumerated in the act of Congress of 1792, they said : " We do not intend by the foregoing opinion to exclude the existence of a power in the State to provide by law for arming and equipping other bodies of men for special service of keeping guard and making defence under special exigencies or otherwise, in any case not coming within the prohibition of that clause of the constitution, art. 1, sec. 10, which withholds from the State the power to keep troops." But, aside from all authority, on any fair construction of the constitution, a law to organize the militia of the State for its own purposes, not inconsistent with any law of Congress on that subject, is valid. In right of its sovereignty a State may employ its militia to preserve order within its borders when the ordinary local officers are unable, on account of the magnitude of the disturbance, or of any sudden uprising, to accomplish the result. Our conclusion, therefore, is, the General Assembly might enact the law in question, and that its general scope and effect are not in antagonism with any act of Congress

on the same subject. Although, in minor matters of detail in the organization of the active militia of the State, some regulations might be found not in harmony with the act of Congress, the utmost that could be said would be that they would give way to the paramount laws of the United States.

That being the case we might here close the discussion, for if the law in relation to the militia in the main is a constitutional enactment, it would be a sufficient warrant for the conduct of defendant, notwithstanding some minor regulations might be. invalid because in conflict with the laws of the United States.

But, as we have been urged by both parties to do so, we will briefly state our views on some of the most important provisions and regulations found in the State law which, it ' is insisted, are in conflict with acts of Congress, and for that reason render the whole act inoperative and void. We will be assisted to a clearer understanding of the remaining questions to be discussed, by keeping in mind a few propositions which are so plain as to admit of no controversy :

1.  The repugnancies alleged to exist in the Military Code of the State with the acts of Congress, are all to be found in those sections of the statute which relate to the organization of the active militia when organized for State purposes, and not to those sections which relate to the entire body of the militia, nor to the militia when called into the service of the United States.

2.  The acts of Congress prescribe essentially different regulations for the organization of the militia when called into actual service, and for the organization for training under State authority. Many of the latter seem to be only directory, while the former all appear to be mandatory.

3.  When not in actual service, the act of 1792 provides, "the militia of each State shall be arranged into divisions, brigades, regiments, battalions and companies, as the legislatures of the States may direct."

4.  Non-essential differences in the regulations as to militia

not in actual service of the Union, contained in a State law, with acts of Congress, will not render the former invalid.

It is no valid objection to this act of the legislature that it does not require the entire militia of the State to be enrolled as "active militia." Counsel do not wish to be understood as claiming that no militia law is valid unless it provides that each and every male inhabitant of the specified age should at all times be armed and equipped and engaged in drilling and maneuvering. But the argument made is, that the performance of military service in times of peace can not be legally confined to a select corps consisting of a limited number of volunteers to the exclusion of all other able-bodied male residents of the State. The argument admits of several conclusive answers that may be shortly stated: 1. It is a matter dependent on the wisdom of Congress whether it will provide for arming and disciplining the entire body of the militia of the United States. 2. The citizen is not entitled under any law, State or Federal, to demand as a matter of right that arms shall be placed in his hands; and, 3. It is with the legislative judgment of what number the active militia of the State shall consist, depending on the exigency that makes such organization necessary.

Numerous minor repugnancies, it is insisted, exist in the State law with the acts of Congress, among which it is said the State law fixes the numerical strength of a company at a number different from the act of Congress. As we have seen, the matter of organizing the militia when not in actual service, but for the purpose of training, under the act of Congress, into divisions, brigades, regiments, battalions and companies, shall be done as the State legislatures may direct. In respect to the number of men that shall compose a company, the language of the United States law is, "each company may consist of sixty-four privates;" but it is not made imperative. The same may be said as to the omission in the State law to provide for the appointment of a major-general.

Such an officer might find no appropriate position in the active militia of the State. Upon the requisition of the President upon the State executive for the militia for active service in the Union, it is then made the duty of the executive to organize the whole body of the militia, or such portion as the President may direct, in conformity with the acts of Congress. In that event, under the act of 1792, each company shall have from sixty-four to eighty-two privates. In a complete organization of the militia, such as the executive of the State is authorized to make on the requisition of the President or otherwise, a major-general would be an appropriate and necessary officer.

Another repugnancy is said to consist in " substituting the organization of the regular army for the militia." Exactly what counsel means or wishes us to understand by the use of the word " organization," we may not comprehend fully. If it is meant, what shall be the constitution of a regiment, battalion or company under the State law, then it is not in conflict with the act of Congress of 1792, for it provides that may be done as the "legislature of the State may direct." But if the discipline and exercises to be enforced and observed in the State militia organization is meant, then it may be noted that the act of 1820 provides, "the system of discipline and field exercise which is ordered to be observed in the different corps of infantry, artillery and riflemen of the regular army, shall also be observed in such corps, respectively, of the militia." That provision may be applicable to the militia only when called into the service of the United States, but if it applies as well to the militia not in actual service, then there is no repugnancy between the act of Congress and the State law in this respect.

But there is another view that may be taken. The act of Congress provides that the militia, when called to the actual service of the United States, " shall be subject to the same rules and articles of war as the regular troops of the United States." The " active militia" of the State is simply a re-

serve force, that the executive is authorized by the constitution to call to his aid in case of a sudden emergency,—"to execute the laws, suppress insurrection and repel invasion,"— and it is most probable it was the design of the General Assembly to make its "organization," "equipment" and "discipline" the same as the militia when in the actual service of the United States, as being the most effective. In either view no such repugnance is perceived between State and Federal legislation in this respect as would render the former invalid.

An objection broader in its scope than either of those noted is, that the active militia organized under the statute comes within the prohibition of the second clause, section 10, art. 1 of the constitution of the United States, which withholds from the States the power to keep "troops" in time of peace. Our understanding is, the organization of the active militia of the State conforms exactly to the definitions usually given of militia. Lexicographers and others define militia, and so the common understanding is, to be "a body of armed citizens trained to military duty, who may be called out in certain cases, but may not be kept on service like standing armies, in time of peace." That is the case as to the active militia of this State. The men comprising it come from the body of the militia, and when not engaged at stated periods in drilling and other exercises, they return to their usual avocations, as is usual with militia, and are subject to call when the public exigencies demand it. Such an organization, no matter by what name it may be designated, comes within no definition of "troops," as that word is used in the constitution. The word "troops" conveys to the mind the idea of an armed body of soldiers, whose sole occupation is war or service, answering to the regular army. The organization of the active militia of the State bears no likeness to such a body of men. It is simply a domestic force as distinguished from regular "troops," and is only liable to be called into service when the exigencies of the State make it necessary.

The fact the men comprising the active militia are required to be sworn to obey the "orders of the commander-in-chief and such other officers as may be placed over" them, is made a ground of unfavorable comment. The oath the militia are required to take obligates them to "bear true allegiance to the United States and the State of Illinois," and to "support the constitution thereof." Obviously, the obedience the militia are bound to observe to the orders of the Governor, is when they are in the service of the State, and not in actual service of the United States. And why should they not observe the orders of the Governor? He is, by the State constitution, made the commander-in-chief of the militia when not in service of the United States. An intention to provide that the militia shall be subject to the orders of the Governor, when in the actual service of the Union, should not be imputed to the legislature when a contrary construction, which is clearly warranted by the context, would hold the law a constitutional enactment. This principle was recognized and declared in *Middleport* v. *Ætna Insurance Co.* 82 Ill. 562.

Among the general provisions contained in art. 11, sections four, five and six have been made the subjects of severe criticism as being repugnant in some way to the laws of the United States. All these sections might be eliminated from the statute, if found repugnant to acts of Congress passed in pursuance of the constitution, and that would not affect in the slightest degree the efficient organization of the active militia of the State. They are simply what they purport to be—"general provisions." But with what acts of Congress are they inconsistent or repugnant? Section four provides: "no military company shall leave the State with arms and equipments without the consent of the commander-in-chief." If we give to this section of the statute a common-sense construction and narrow its application to the militia when not in the actual service of the United States, as must have been the intention of the legislature as clearly appears from the

whole spirit of the act, we are relieved from all embarrass-
ment as to its meaning. Assuming, as a proposition too plain
to admit of doubt, that this section of the statute applies only
to the militia when not in the service of the United States,
it may well be asked what right has a body of militia, organ-
ized into a military company, " with arms and equipments "
furnished by the State, to go into another State, beyond the
jurisdiction of this State, without the consent of the com-
mander-in-chief? The mere statement of the question is
sufficient to suggest a negative answer. The presence of such
armed forces in another State might tend to disturb our
friendly relations with such State, and might be the cause of
embarrassing complications.

The fifth section contains a clause that makes it unlawful
" for any body of men whatever, other than the regularly
organized volunteer militia of this State and the troops of
the United States," with an exception in favor of students in
educational institutions where military science is taught as a
part of the course of instruction, " to associate themselves
together as a military company or organization, or to drill or
parade with arms in any city or town of this State, without
the license of the Governor." We have been referred to no
source whence comes the right contended for, to bodies of
men organized into military companies, under no discipline
by the United States or State authorities, " to parade with
arms " in any city or public place as their inclination or
caprice may prompt them. No such right is conferred by any
act of Congress, nor is it insisted this provision of our statute
is in conflict with any paramount law of the United States.
It is a matter that pertains alone to our domestic polity. The
right of the citizen to " bear arms " for the defence of his
person and property is not involved, even remotely, in this
discussion. This section has no bearing whatever on that
right, whatever it may be, and we will enter upon no discus-
sion of that question. Whether bodies of men, with military
organizations or otherwise, under no discipline or command

by the United States or the State, shall be permitted to "parade with arms" in populous communities, is a matter within the regulation and subject to the police power of the State. In matters pertaining to the internal peace and well-being of the State, its police powers are plenary and inalienable. It is a power co-extensive with self-protection, and is sometimes termed, and not inaptly, the "law of overruling necessity." Everything necessary for the protection, safety and best interests of the people of the State may be done under this power. Persons and property may be subjected to all reasonable restraints and burdens for the common good. Where mere property interests are involved, this power, like other powers of government, is subject to constitutional limitations; but where the internal peace and health of the people of the State are concerned, the limitations that are said to be upon the exercise of this power are, that such "regulations must have reference to the comfort, safety and welfare of society." It is within the power of the General Assembly to enact laws for the suppression of that which may endanger the public peace, and impose penalties for the infraction of such laws. What will endanger the public security must, as a general rule, be left to the wisdom of the legislative department of the government. The provision contained in the fifth section cited was intended by its restraining force to conserve the public peace. That being its object, it is not an unreasonable restraint upon the liberty of the citizen, and is within no limitation upon the exercise of the police power of the State.

The judgment will be reversed and the cause remanded.

*Judgment reversed.*

Mr. JUSTICE MULKEY dissenting.