# CASES DETERMINED

AT THE

# January Term, 1925.

---

STATE, Appellant, vs. INDUSTRIAL COMMISSION OF WIS-
CONSIN and another, Respondents.

*December 15, 1924—February 10, 1925.*

*Workmen's compensation: Member of National Guard as employee
of state: Compensation for injuries received at target prac-
tice.*

The National Guard of Wisconsin is principally and primarily a
state institution, provided for and in harmony with the power
of Congress as contained in sub. 16, sec. 8, art. I, Const. U. S.,
and· the National Defense Act and its amendments did not
abolish the Guard as a state institution and make it an integral
part of the national army; hence a member of the Guard who
in time of peace was injured while at target practice is an
employee of the state and entitled to compensation from the
state under the provisions of the workmen's compensation
· act.

APPEAL from a judgment of the circuit court for Dane
county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

The appeal is from an order confirming an award of the
*Industrial Commission* in favor of the defendant *Clifford
Johnson.*

For the appellant there was a brief by the *Attorney Gen-
eral* and *Mortimer Levitan,* assistant attorney general, and
oral argument by *Mr. Levitan.*

For the respondents there was a brief by *John B. Sanborn*
of Madison, Judge Advocate General, Wisconsin National
Guard, attorney for the *Industrial Commission,* and *Fiedler*

& *Garrigan* of Beloit, attorneys for *Clifford Johnson,* and oral argument by *Mr. Sanborn.* .

DOERFLER, J. The claimant, *Johnson,* sustained his injuries at Camp Douglas, while at target practice, as a member of the National Guard of Wisconsin.

The position taken by the attorney general is that the National Guard of Wisconsin is a part of the federal army, and not an organization of the state militia, and that consequently, being a federal employee, he is not entitled to compensation from the state under the workmen's compensation act. On the other hand, counsel for the defendants contend that claimant at the time of receiving his injuries was a member of the National Guard; that such Guard is distinctively a state institution; that he was therefore an employee of the State, and as such is entitled to compensation. .

The State in taking the position above outlined relies largely upon the provisions of the National Defense Act, which was enacted in 1916, and at various times thereafter, until 1922, amended. It is not seriously contended by the State that prior to the enactment of the National Defense Act the National Guard was not a state organization, but it is contended that the Defense Act worked a vital and material change as to the status of the Guard, all with the result that it can no longer now be deemed a part of the militia, as that term is used in the federal constitution, but that it has become an integral part of the national army. It must also be conceded that the act contains provisions which, standing alone, would indicate that Congress proceeded under its army power as provided by the constitution, rather than the militia power. The intention of the legislative body, however, must be ascertained from the act as a whole, from the objects and purposes which Congress designed to effect, and from the general spirit of the act itself, bearing in mind at all times the constitutional provisions applicable to the situation.

From the time of the framing of the constitution two distinct military organizations were expressly recognized,—the one the national army, created by Congress as the so-called standing army, which is in constant service and which is available at all times for the suppression of rebellions and insurrections, and for national defense in times of war; the other the militia, a state organization primarily in the service of the state, and subject to the call of the nation in the event of a national emergency. The national army consists of professional soldiers, who are in the continuous service of the government; while the members of the militia are taken from the rank and file of the people, all pursuing their respective avocations in life, but devoting a certain portion of their time to training, so as to enable them to perform effective service when called upon by the state in times of peace and by the national government in times of a national emergency.

Up to our entry into the great World War, with the exception of the Civil War, the Spanish-American War, and the Mexican War, this country has lived for a period of over a century in a comparative state of peace. From the experience of European nations, the conviction fastened itself upon our people that a large standing army was inimical to the maintenance of our democratic form of government, and from the very beginning of our history a large portion of our citizenship was opposed to a large standing army. The country was settled largely by emigrants coming from continental Europe, where the practice had obtained for centuries to maintain large standing armies, and where but few of the citizens were immune from military service. This situation was deemed oppressive, and in order to obtain relief great numbers came over here, settled down permanently and became citizens, being induced so to do by the relief afforded them under our form of government. It was assumed in the early day, and until a comparatively recent period of our history, that the United States occupied a

State v. Industrial Comm. 186 Wis. 1.

rather unique position among the nations of the world by being isolated, and therefore not readily a subject of military attack. The views so entertained unquestionably account in a large measure for the small regular army maintained by the national government. However, the framers of the constitution very wisely foresaw the necessity for a military organization not a part of the regular army, but nevertheless a powerful force which could be called upon in an emergency by the national government. They thus made provision in the constitution for recognizing the militia, and by art. II of the amendments to the constitution it is provided that "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed," so that the militia was at all times recognized as a distinct state organization, devoted primarily to suppress internal upheavals within the state.

Our experience during the Spanish-American War, in which the members of the militia were called into federal service, had taught us that in order to insure a more effective potential force in the form of a well-organized and disciplined militia, it would be necessary to extend to the militia of the states an inducement which would inure not only to the benefit of the various states but also to the nation at such times when the militia might be called into the federal service. This inducement consisted of federal aid to the states, under which the state military organizations might be organized into proper units, officered by capable and efficient officers, supported in a large measure by federal funds, and allocated to larger divisions, all in harmony with the general scheme that in the event of the happening of a national emergency the state military units might be in a position to perform more efficient service.

The World War, which began in 1914, and the events which transpired subsequent to the beginning of such war, under which it became apparent that this country would also be drawn into and engulfed in the same, were the immediate

causes of the enactment of the National Defense Act. It must be conceded that the National Defense Act wrought a material change with respect to the National Guard. This change, however, while it effected a greater unification of the National Guard with the federal army, and created conditions which to a very large extent strengthened the Guards, from the standpoint of efficiency, when they might be called upon by the federal government, did not in any respect weaken the Guard as a state organization, nor did it wipe out or eliminate its character as a distinctive state organization. While it is known under the name of National Guard, it still retains its essential features as a part of the militia. Nowhere in the act can be found a provision which in times of peace alters the control which the state has over the Guard. Had such an important and vital change been contemplated by Congress, affecting an institution having its origin at the very time of the inception of the government and which had continued for more than a century, it would not have left the matter subject to mere inference; on the contrary, it would by its legislation have in express terms wiped out the very existence of the National Guard as a state institution and expressly made it a part of the federal·army. The loyalty that we owe to the government and the respect which is due to Congress, a representative body of our people, forbid the unwarranted and violent assumption that under the National Defense Act any such radical change had been contemplated, based upon mere inference. Throughout this voluminous enactment, consisting of 128 sections, the retention of the Guard as a part of the militia is clearly made manifest.

A review of the various sections of the Defense Act, or of all of the sections referred to by the learned attorney general, would be unjustifiable and unwarranted for the purposes of this opinion. That Congress did not intend or propose to constitute the militia as a part of the federal army in times of peace is definitely set at rest by the very

first section of the act, which provides: "That the Army of the United States shall consist of the Regular Army, the National Guard while in the service of the United States, and the Organized Reserves, including the Officers' Reserve Corps and the Enlisted Reserve Corps." The Guards are in the service of the United States when they are called forth "to execute the laws of the Union, suppress insurrections, and repel invasions." Sub. 15 of sec. 8 of art. I of the federal constitution. So that if the National Guard under art. I is a part of the federal army only while in the service of the United States, then it follows that while not in such service it is a state organization.

Sec. 116 of the act provides:

"Whenever any state shall, within a limit of time to be fixed by the President, have failed or refused to comply with or enforce any requirement of this act, or any regulation promulgated thereunder and in aid thereof by the President or the secretary of war, the National Guard of such state shall be debarred, wholly or in part, as the President may direct, from receiving from the United States any pecuniary or other aid, benefit, or privilege authorized or provided by this act or any other law."

The foregoing quoted section is the only penalty prescribed by the act for the failure of the Guard to comply with any of the rules, regulations, and orders of the President or the secretary of war. This, of course, has reference to times of peace. In order, therefore, that the Guard may receive the financial aid which the act provides for, Congress has seen fit, in order to accomplish the objects and purposes of the act, to extend such aid as an inducement. This clearly shows that the act was not intended to be compulsory, but optional, and in enacting such legislation it clearly had in mind its constitutional limitations upon the subject. If, therefore, the Guard was not properly officered, if it did not submit to training so as to reach the standard prescribed by

Congress and the secretary of war, such failure or refusal would in no way eliminate or wipe out the Guard or work a discharge of its officers. The only result that would follow is a withdrawal of federal aid. The Defense Act is subject to no other construction.

The oaths prescribed for members of the Guard (sec. 70) and for the officers (sec. 73) recognize their dual capacity, viz. the duties which they owe to the state in times of peace, and those which they owe to the federal government when called upon in a national emergency. The Guard is enlisted by state officers and it is under the command of such state officers. The expense of maintaining the Guard is shared by both the federal and the state governments.

The act provides for organizing, arming, and disciplining the militia in compliance with sub. 16 of sec. 8, art. I, of the constitution. This power has thus expressly been conferred upon Congress by the constitution. In order that the Guard may be properly organized, the act prescribes the limit of a unit. It also constitutes this unit as a part of larger units, which may consist of National Guards of other states and of the regular army. These provisions were designed for disciplinary purposes, so that in the event of a national emergency an orderly system will be created to facilitate the needs of the national government in all cases when the militia may be called into action. A refusal to comply with any of these regulations may work a failure to receive federal aid.

The approval of officers of the National Guard is also a part of this scheme. Under the provisions of ch. 21 of the Wisconsin statutes, the governor is expressly authorized to

"alter, divide, transfer, consolidate, disband, or reorganize any organization; to create new organizations, and to enlist, organize and prescribe regulations to govern a reserve corps for the organized militia so as to conform in quota of troops and arm or kind of service to any organization or system

now or hereafter adopted by the regular army or prescribed by order of the secretary of war for the government of the organized militia."

"The organization, armament, and discipline of the Wisconsin National Guard shall be the same as that which is now, or may hereafter be 'prescribed for the regular and volunteer armies of the United States; and the governor may by order perfect such organization, armament and discipline, at any time, so as to comply with the laws, rules and regulations that may be prescribed for the regular and volunteer armies of ·the United States; and the governor shall have power to fix and from time to time to alter the maximum number of enlisted men which shall form part of any organization of the Wisconsin National Guard; provided, that such maximum shall not exceed the statutory maximum prescribed for a like organization of the regular army."

These provisions were all designed by the legislature of Wisconsin to promote the efficiency of the Guard, both as a state organization and as an organization which may be called upon to perform service for the national government when an emergency arises.   Many other provisions might be alluded to and commented upon to support the conclusion. which we have arrived at, that the Guard is principally and primarily a state institution, but no useful purpose could be served thereby.

The views herein expressed are supported by two able decisions of the state courts.  In the case of *Bianco v. Austin*, 204 App. Div. 34, 197 N. Y. Supp. 228, which was an action brought by a member of the National Guard to procure his discharge, in the state courts of New York, and which involved the question whether the state court had jurisdiction of the matter or whether it was within the jurisdiction of the federal court, and in which case the identical ·questions herein presented were involved, the court said:

"Because the act establishes a definite, comprehensive scheme for the organization, training, discipline, and administration of the National Guard under federal supervision and control as a single national unit in place of the

then existing independent National Guard organizations in the respective states, and provides for calling the National Guard into federal service, not merely as militia under the clause of the constitution above referred to, but as an organized component part of the United States army in the event of a national emergency declared by Congress, it is contended that the act makes the National Guard a part of the army; further, that as the petitioner voluntarily assumed an obligation to obey the orders of the President of the United States and to render military service to the United States beyond that required of the state militia, a state court is without jurisdiction to annul or set aside the petitioner's obligation to the federal government.

"But in these contentions appellant loses sight of the fact that the National Guard is only a potential part of the United States army, and does not in fact become a part thereof until Congress has made the requisite declaration of the existence of an emergency. The oath of allegiance on enlistment is both to the United States and to the state, and the promise to obey the orders of the President of the United States and of the governor of the state of New York (as well as of the soldier's officers) is because the governor is commander-in-chief of the National Guard until Congress declares an emergency to exist and the Guard becomes an actual part of the National Army, when the President becomes commander-in-chief.

"I reach the conclusion, therefore, that in time of peace the state courts have jurisdiction of a proceeding to secure the discharge of a member of the National Guard of the state."

See, also, *Nebraska National Guard v. Morgan* (Neb.) 199 N. W. 557.

The rulings of federal officials and federal departments also recognize the status of the National Guard as above set forth, as appears from the citations in the brief of the learned judge advocate general of the Wisconsin National Guard, who represents the *Industrial Commission of Wisconsin* herein. It is clear that the organization provided by the National Defense Act, and the various standards set by the federal government under the act, together with the dis-

ciplining of the militia, were all provided for and in harmony with the power of Congress as set forth under sub. 16 of sec. 8, art. I, of the constitution. It was so determined by the learned trial court, and we approve of his decision.

In conclusion we desire to express our appreciation of the able, exhaustive, painstaking, and lawyerlike brief of the learned attorney general and his assistant.

*By the Court.*—Judgment affirmed.