## UNIVERSITY OF MARYLAND *v.* ENNIS H. COALE ET AL.

### [No. 47, April Term, 1933.]

*Decided June 21st, 1933.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Willis R. Jones, Deputy Attorney General,* and *G. C. A. Anderson, Assistant Attorney General,* with whom was *William Preston Lane, Jr., Attorney General,* on the brief, for the appellants.

*John H. Skeen* and *Reuben Oppenheimer,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

This appeal presents the question whether the University of Maryland has the right to suspend a student because of

his refusal to take the regular university course in military training, when such refusal is based on his sincere, conscientious, religious convictions.

The appellees, Ennis H. Coale, twenty years of age, and his father, Howard Cronin Coale, are residents of Harford County, Maryland, and the latter is a taxpayer of that county. Both the father and son are members of the Methodist Episcopal Church, and the son is a member of the Epworth League, a society of the Methodist Church. Ennis Coale attended the Bel Air High School to the end of the course, and thereafter worked on his father's farm for three years. In the spring of 1932, he decided to attend college, and with that end in view he sought information from various colleges and universities. He obtained a catalogue from the University of Maryland, and found that it contained the following provision: "All male students, if citizens of the United States, whose bodily condition indicates that they are physically fit to perform military duty or will be upon arrival at military age are required to take for a period of two years, as a prerequisite to graduation, the military training offered by the War Department."

Ennis Coale stated that it was his belief that war was against Christ's teachings and was therefore wrong. He was asked if he knew the position the Methodist Episcopal Church had taken on the question of participation in war, and he replied: "No, I cannot say fully. I know that it does not require its members not to go into military service." He testified that he was familiar with the resolution passed at the General Conference of the Methodist Episcopal Church in 1932 on the subject of military training. He had read it in the Epworth League paper, to which he subscribed. The resolution is as follows: "We hold that our country is benefited by having as citizens those who unswervingly follow the dictates of their consciences. * * * Furthermore, we believe it to be the duty of the churches to give moral support to those individuals who hold conscientious scruples against participation in military training or military service. We

226

petition the government of the United States to grant to members of the Methodist Episcopal Church who may be conscientious objectors to war the same exemption from military service as has long been granted to members of the Society of Friends and other similar religious organizations. Similarly we petition all educational institutions which require military training to excuse from such training any student belonging to the Methodist Episcopal Church who has conscientious scruples against it. We earnestly petition the government of the United States to cease to support financially all military training in civil educational institutions."

This resolution, passed in May, was read by Ennis Coale in that or in the following month, and it had, he thought, the effect of strengthening his views in opposition to war. And before reaching a conclusion, he had heard the subject of military training discussed in public meetings of the Epworth League and in Sunday School classes, and had also discussed the subject with Mr. Ehlers, the pastor of his church. He had also been in communication with Mr. Tucker Smith, one of the secretaries of a Committee on Militarism and Education, with offices in New York City. When asked how he came to get in touch with Mr. Smith, Coale said: "A few weeks before college opened I saw a public letter in the Sun, a letter to the editor, which said any students who intended to attend the University of Maryland who wished to be exempted from military training to write to this office, and they would give them the best procedure to use. So, I wrote there, and they sent the pamphlet giving the procedure. In this pamphlet it said it would be a good idea to write out a statement with your reasons for objecting to military training, and also to have a statement from your parents and from the minister, which I did. I did not get any ideas for the statement out of the pamphlet."

As stated by Coale, he "did not contact" with Mr. Smith personally, that is, he did not see him, until after he had registered at the university.

At the opening of the university, in the Fall of 1932,

young Coale registered as a student. Before that time, so far as the record discloses, he had not communicated with Dr. Pearson, the president of the university, or with any one in authority, his unwillingness to take military training. On reaching the university to register for the college of arts and sciences, he asked where he could lodge his protest against military training, and was told to see the dean of the university, which he did. The dean told him to see Major Gillem, the military instructor, who in turn told him to see Dr. Pearson, as he was the final authority. He saw Dr. Pearson with Major Gillem present. As to this interview, Coale testified: "I gave Dr. Pearson the statement I had written, and my father's statement, and asked that I be excused from military training, and he tried to convince me that I was wrong. In that statement, or during that conversation, I said that I wouldn't take the military training, and he, of course, showed me that was a very dictatorial attitude, and I agreed before I left to take it for a week until he would see some of the higher authorities."

The written statement presented to Dr. Pearson by Coale is as follows:

"To whom it may concern:

"I wish to protest against the course in Military Science which students at the University of Maryland are supposed to take.

"I object to it on the following grounds:

"1. I have conscientious scruples against war or preparation for war.

"2. I do not believe that the United States should prepare for war after signing the Paris Peace Pact.

"3. I do not believe that one's ideas of good citizenship should come from a paid officer of the War Department.

"4. I believe that the funds used for this purpose could be used for a much better purpose.

"5. As a member of the Methodist Church and Epworth League, which are against compulsory military training, I could not take such a course.

"6. I believe that the time spent on a course in military training could be used for something more worthwhile. I am going to refuse to take the course in Military Science because I believe that is one of the ways in which I can help to do away with the wasteful and unreasonable war system."

Pursuant to the agreement mentioned, Coale reported for military training, and was told to return the following Monday, but before that time arrived he received the following letter from Dr. Pearson:

"After having discussed with some members of our faculty, your request of yesterday to be relieved of military training, I find that under the rules of the University your request cannot be granted.

"If you were disabled physically, you could be excused immediately.

"Please let me emphasize again that military training as given in this institution has great value from the standpoint of physical welfare of the students. It has great value, also in developing the elements of discipline and the fundamentals of organization, all of which means good citizenship. * * *"

On September 24th, a letter of the same import was written by the president to Howard Cronin Coale, the father, with this additional statement:

"I am sure if the Board of Regents and our faculty felt that military training such as is given in this University tended to increase the war spirit or the likelihood of war, they would do everything possible to have the laws and regulations changed."

On October 5th, Dr. Pearson again wrote Ennis Coale, saying:

"In view of your unwillingness and failure to comply with regulations of the University, you are hereby suspended from the University.

"When you give proper assurance that you will abide by the regulations, it will be a pleasure to reinstate you."

Thereafter, on October 7th, Ennis Coale wrote Dr. Pearson as follows:

"I am going home for the week-end, as I do not want to make myself any more cost to the University than I can help, after your kind offer to refund all expenses. I do not have any way to take much baggage, and will be back next week, probably, to get it, and get my withdrawal or suspension satisfactorily settled.

"I want to thank you for your attention and courtesy in this matter, and trust that the regulations will ultimately be changed, so that students who come after me will find it easier to get an education without going contrary to their beliefs."

On October 10th, he again wrote Dr. Pearson as follows:

"I have decided to attend classes until the Board of Regents have reached a decision on the matter of military training. If I did not, in the event that I could continue, I would be very much behind in all my work.

"Of course, if this is impossible, please let me know. Please do not have the money refunded until the Board has reached a definite decision."

Upon receipt of these letters, Dr. Pearson assumed, as stated by him, that Coale was "going to go ahead with his military work, and I called him into my office and complimented him and told him I was fully aware of his conscientious feeling, and that I would personally take the matter up with the Commandant and see that he was not asked to do anything in the Military Department to which he could reasonably object. I felt very much pleased. I thought everything was settled. Until that moment I thought he was wholly sincere, but after considerable hesitation he informed me at that time that he would be unable to take any of the work under any condition whatever with any exceptions that might be made. * * * And then I had to tell him that his suspension was still in effect. Q. What, in particular, did you tell him you would do in the way of relieving him of

portions of 'the course in the Military Department? A. I told him he would not have to do anything with any weapons. Q. What did you say was his attitude? A. His attitude was very evident that he appreciated my statement, and he wanted to accept it, but 'after considerable thought he rejected it. He refused to take any part of the work in the Military Department."

Dr. Pearson was then asked what he meant by the expression, "Until that moment I thought he was wholly sincere." He replied: "Well, until that moment I thought he was acting from his own motive only, although I felt that that motive was mistaken, but at that time it came into my mind rather forcibly, that he was not acting in accordance with his own best judgment."

On October 13th, 1932, a petition addressed to the authorities of the University of Maryland was presented to them by Ennis Coale. This petition requested reinstatement when his request for exemption was granted. The reasons given by him at that time were in the main those presented by him for exemption from military training at the earlier date, although enlarged upon, with the exception that he assigned the further reason that "I cannot afford to go to a private college where the costs would be greater and am, therefore, compelled to urge my right to an education at this tax-supported university, which my father, as a citizen and taxpayer of the State, is compelled to support."

As Coale refused to take military training, his suspension stood unrevoked, and on December 20th, 1932, he with his father filed a petition in the Superior Court of Baltimore City asking for the issuance of a mandamus directed to the defendants, the president and executive head of the University of Maryland, and the members of the board of regents of the university, the appellants in this court, preventing and restraining them from refusing permission to the said Ennis H. Coale "to pursue his studies at the University of Maryland unless he agrees to pursue a course in military training, and commanding him and them to allow the said Ennis H. Coale to be reinstated in the said University of Maryland

for the purpose of pursuing his course of study therein, upon taking such course or courses in lieu of military training as the defendants may direct, and further ordering and requiring such other relief and protection to your petitioners and their rights as aforesaid, as may be proper and necessary in the premises." The case was heard by the judge sitting in the court named, who, after full consideration of all the pleadings and evidence in the case, ordered the writ of mandamus to be issued as prayed. It is from that judgment of the court that the appeal was taken.

The sole claim here made by the appellees is that a sincere, religious, conscientious objector is legally and constitutionally exempt from a compulsory course in military training at the University of Maryland upon his taking such other course or courses as the authorities may designate.

The present University of Maryland is a consolidation of the University of Maryland, as incorporated by the Acts of 1812, chapter 159, and the Maryland State College of Agriculture, incorporated under the Acts of 1916, chapter 372. The act of consolidation was passed by the Legislature of 1920, chapter 480. There is no special provision contained in the act of 1812, incorporating the Maryland University, in relation to military training.

In 1862, Congress passed a land grant act known as the Morrell Act (Act Cong. July 2nd, 1862 [12 Stat. 503]), which provided for federal appropriations for certain state colleges or universities, the title of the act being "An Act donating Public Lands to the several States and Territories which may provide Colleges for the Benefit of Agriculture and the Mechanic Arts." The money so provided was to be used for the "endowment, support, and maintenance of at least one college where the leading object shall be without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts in such manner as the legislatures of the States may respectively prescribe. * * *" Section 4 (7 U. S. Code Ann., sec. 304).

By the Acts of 1864 of the General Assembly of Mary-

land, chapter 90, the State declared its acceptance of the provisions of the Act of Congress of 1862, and the comptroller of the treasury was thereby "authorized to receive from the proper authorities of the United States, the land scrip to be issued for the lands granted to this State by the said act of Congress," which were to be sold by him and the proceeds invested as therein stated. And by the subsequent act of 1865, chapter 178, it was provided that "the annual interest or income of said investment shall be regularly paid by him * * * to the Maryland Agricultural College," and therein using the exact language of the federal act of 1862 as to the course of studies, including military tactics. The Maryland Agricultural College thereby became a land grant college, and thereafter, until the passage of the Acts of 1916, chapter 372, whereby the Agricultural College became the Maryland State College of Agriculture, military training was one of the courses taught at that college; and the exact language used in the Acts of 1865, chapter 178, as to the course of studies to be taught therein, was again used in the Acts of 1916, chapter 372, incorporating the State College of Agriculture.

It will be seen that there was nothing in said federal and state acts forbidding military training in the colleges mentioned. But on the contrary such course of training was specially authorized therein.

The act of consolidation, chapter 480 of the Acts of 1920, conferred upon the regents of the University of Maryland all the powers, rights, and privileges of the board of trustees of the Maryland State College of Agriculture, and charged them with all the duties and obligations, which, at the time of the consolidation, appertained to such board of trustees, thus conferring upon them the power and authority to continue such military training. And there is no provision in any of said acts exempting any sincere, religious, conscientious objector from military training. Therefore, if there be any legal or constitutional exemption on the grounds stated, it must be found elsewhere in the federal or state constitutions or in the acts of congress, or the legislative acts of this state.

Our attention has been called to no case, either in the federal or state courts, where the exact question here presented has arisen. But in the recent case of the *United States v. Macintosh,* 283 U. S. 605, 51 S. Ct. 570, 575, 75 L. Ed. 1302, where it was urged that the conscientious objector is protected by the Constitution from bearing arms, the court said: "The conscientious objector is relieved from the obligation to bear arms in obedience to no constitutional provision, express or implied; but because, and only because, it has accorded with the policy of Congress thus to relieve him. * * * The privilege of the * * * conscientious objector to avoid bearing arms comes, not from the Constitution, but from the acts of Congress. That body may grant or withhold the exemption as in its wisdom it sees fit; and, if it be withheld, the * * * conscientious objector cannot successfully assert the privilege. No other conclusion is compatible with the well-nigh limitless extent of the war powers * * * which include, by necessary implication, the power, in the last extremity, to compel the armed service of any citizen in the land, without regard to his objections or his views in respect of the justice or morality of the particular war or of war in general.

In *Jacobson v. Massachusetts,* 197 U. S. 11, 29, 49 L. Ed. 643, 651, 25 S. Ct. 358, 362, 3 Ann. Cas. 765, this court, speaking of the liberties guaranteed to the individual by the Fourteenth Amendment, said: " '* * * And yet he may be compelled, by force if need be, against his will and without regard to his personal wishes or his peculiar interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense.' " See *United States v. Schwimmer,* 279 U. S. 644, 49 S. Ct. 448, 73 L. Ed. 889.

In *United States v. Macintosh, supra,* the appellee had applied for naturalization. In the preliminary form for petition for naturalization the following question, among others, appears: "If necessary, are you willing to take up arms in defense of this country?" The appellee's answer to this

234

question was: "Yes; but I should want to be free to judge of the necessity." In other words, he and not the government was to determine the necessity for war. By the amplified answer to this question subsequently filed, he said: "I am willing to do what I judge to be in the best interests of my country, but only in so far as I can believe that this is not going to be against the best interests of humanity in the long run. .I do not undertake to support 'my country, right or wrong' in any dispute which may arise, and I am not willing to promise beforehand, and without knowing the cause for which my country may go to war, either that I will or that I will not 'take up arms in defense of this country,' however 'necessary' the war may seem to be to the Government of the day."

If the facts ruled on in that case afforded no constitutional protection to Macintosh, a conscientious objector, it is difficult to conceive how the Constitution can in this case afford any protection to the appellee as a conscientious objector in his refusal to take military training at the university where he had registered as a student. Not only was he without constitutional support in refusing to take such training, but he was likewise, so far as we have been able to discover, without any law, federal or state, in support of his contention. By the rules of the university, Ennis Coale was to take military training throughout the first two years of his college course and no longer, unless he elected to continue it. Had he taken the course prescribed by the rules of the university, he, while serving through the first two years of the course, would in no way have been attached to or connected with the army of the United States or to the national guards, nor would he thereby have assumed any obligation to bear arms in the service of his country. In the absence of any such obligation, it could not properly be said that the training received was in preparation for war, unless he of his own accord decided to continue the course and then voluntarily assume such obligations.

The claim made by the plaintiffs that the alleged misconduct of those in authority, the president and the board of

regents of the university, was in contravention of certain provisions of the Constitution, and in violation of the chartered rights of the university, forbidding religious discrimination in the exercise of their authority, is, we think, without merit. In support of this contention, the appellee relies on the Fourteenth Amendment of the Federal Constitution, in which it is said: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." He also relies on the chartered powers and privileges which the appellee contends have been violated. These are: "No sectarian or partisan test shall be allowed or exercised in the appointment of trustees or in the appointment of any instructors or other officers of the College or in the admission of students thereto or for any purpose whatever; and that the University shall be 'maintained forever upon the most liberal plan, for the benefit of students of every country and every religious denomination, who shall be freely admitted to equal privileges and advantages of education, and to all the honors of the University, according to their merit, without requiring or enforcing any religious or civil test, urging their attendance upon any particular plan of religious worship or service.' "

The only power or authority above quoted which could possibly have any relation to the contention made is the provision that "no sectarian or partisan test shall be allowed or exercised * * * in the admission of students * * * who shall be freely admitted to equal privileges and advantages of education * * * according to their merit, without requiring or enforcing any religious or civil test."

The charge of wrongful discrimination made against the president and board of regents of the university consisted of the fact that in the past they had exempted members of the Society of Friends from the course in military training, either in full or in part, and such fact, coupled with the refusal to grant a like exemption to Ennis Coale, constituted

an illegal discrimination against him. This contention was adopted by the trial court in reaching its conclusion in granting the prayers of the petition. It is shown by the evidence of Dr. Pearson that, in the six years he has been at the university, three or four students have been excused from taking the military course on religious grounds. Some of these, if not all, were members of the Society of Friends. When asked if it had been the policy of the university to excuse such students, he said: "It has been, up until about a year ago. For example, at the present moment not one student is excused on account of religious pleas, or any other reason except that he is physically disabled."

It is generally known that the Society of Friends has for years opposed war or any participation in war, and laws or regulations have been passed at different times exempting them from bearing arms in a war then existing in which the United States was involved. Such persons, however, were not exempted from service in any capacity which was regarded as noncombatant. But there is no law, federal or state, known to us or to which our attention has been called, which exempts registered students in the University of Maryland from taking the required military course. In the absence of such law, we are of the opinion that any demand made by them to be exempted from such course could not be legally enforced.

It was not until the spring of 1932 that the resolution of the Methodist Episcopal Church, hereinbefore set out in full, was passed, and since that time the policy of the University of Maryland of excusing students from military training upon religious grounds has not been followed, and it now no longer exists. Therefore, whatever may have been the effect of such alleged discrimination, if any, upon others of different faith at the time that policy was in force, such effect cannot now be said to exist.

It may also be said that the facts disclosed by the record seriously if not successfully assail the sincerity of Ennis Coale in his assertion that in refusing to take the prescribed

military training he was actuated by conscientious religious convictions. It was in the Spring of 1932 when he learned from reading the catalogue of the University of Maryland that all male students of the university, if citizens of the United States and physically fit, were required to take, for a period of two years, as a prerequisite to graduation, the military training offered by the War Department. Although opposed to such training, Coale never communicated with the authorities of the university to ascertain whether it would be possible for him to be excused from such training, but waited until the opening of the university late in the following September before mentioning his religious scruples to any one at the university. When he did so, it was on the occasion of his going to the university to register as a student, and after he had registered. He made inquiry then as to where to present his protest against taking the course of military training to which he objected. At that time he not only had letters from his father and the pastor of his church, but also written reasons upon which he based his objection or protest. These he presented to Dr. Pearson, to whom he had been directed. Of the six reasons assigned, only two—the first and fifth—made any reference to his conscientious or religious scruples or convictions. The other four were: (1) That he did "not believe the United States should prepare for war after signing the Paris Peace Pact"; (2) that he did not believe "one's ideas of good citizenship should come from a paid officer of the War Department"; (3) he believed that "the funds used for this purpose could be used for a much better purpose"; and (4) he believed "the time spent on a course in military training could be used for something more worthwhile," and he concluded by saying he was going "to refuse to take Military Science because I believe that is one of the ways in which I can help to do away with the wasteful and unreasonable war system."

It is disclosed by the record that, several months after receiving the catalogue from the university, and about two weeks prior to its opening in the Fall, he saw a public letter to the editor in the Baltimore Sun from one Tucker Smith,

secretary of a Committee on Militarism and Education, with offices in New York City. In this letter he advised any students who intended to attend the University of Maryland, and who wished to be exempted from military training, to write to the office of that society and it would give them the best procedure to use. Ennis Coale, in compliance with that request, wrote Mr. Smith, and in response thereto he was sent a pamphlet, and was advised to write out a statement giving his reasons for objecting to military training; and also to have a statement from his parents and the minister of his church. The object and purpose of the society mentioned was to prevent military training in all civil educational institutions in the country, and four of the written reasons given by Coale are fully in accord with such an effort. His conduct and conversations with Dr. Pearson, who was extremely courteous and tolerant with him, in what might well be considered his unreasonable demand, indicate that he would be satisfied with nothing short of a grant of the request made by him, or an absolute unqualified refusal of his demand, accompanied by his suspension from the University, in order that the litigation since had might result therefrom.

Coale's selection of the University of Maryland, which included military training in its curriculum, when there were other colleges in Maryland of practically the same grade and standing, which he could have attended without taking military training, is consistent with the want of sincerity on his part. He attempts to explain his choice of the University of Maryland by saying that it was his intention to take a law course, and by attending the University he would save one year in the completion of that course, which would start at the beginning of his fourth year. But he could have saved the year of which he speaks had he attended another college or university in the state, with no greater expense to him, for his first two years, and then transferred to the University of Maryland, where he would have been given credit for the time spent at the college first attended, and so would have concluded his law course just as soon as if he had spent the first two years at the University of Maryland; and by doing

this, he could have avoided the military training against which he claims to have conscientious scruples.

It may have been that Coale was to some extent opposed to war and participation in war. But upon the facts stated it is certainly not shown that his refusal to take military training was alone due to such opposition. The question arises, Was not he much less influenced by conscientious, religious, scruples than by a disposition to join the society mentioned to defeat the government in an attempt to be ready for war, if forced upon the country, by providing military training in some or all of the federal aided educational institutions.

The court, we think, would be going very far should it encourage this or like societies, or persons with similar views, in their interference with the constituted authorities in the management and control of colleges and universities when acting upon authority duly and lawfully conferred upon them. Or to give encouragement to such societies or persons to interfere with the government in all lawful efforts to keep the country in a state of preparedness for war so long as the nations of the world continue to settle their disputes by means of war. A great majority of people of this country are opposed to war, but unlike those of whom we have been speaking, they recognize the necessity of being prepared for war when it comes upon us. In preparing for defense, a military training for those who may be called upon to take arms in defense of their country is a necessary incident thereto, and any effort on the part of any of the people to hinder or defeat the government in doing so should not be countenanced by the courts so long as the government acts in the lawful exercise of such power.

The trial court in our opinion was wrong in passing the order appealed from, and the order will therefore be reversed.

*Order reversed, with costs.*