# Richmond

## GLOBE INDEMNITY COMPANY, INSURER, AND COMMONWEALTH, ETC. v. ROBERT H. FORREST, ETC.

November 14, 1935.

Present, Campbell, C. J., and Holt, Hudgins, Browning, Chinn and Eggleston, JJ.

The opinion states the case.

*Aubrey R. Bowles, Jr.,* for the appellant.

*H. Clark Thompson* and *William H. Sands,* for the appellee.

BROWNING, J., delivered the opinion of the court.

The Industrial Commission awarded Robert H. Forrest, an infant, compensation in the sum of $14 per week for a period of 400 weeks, under the provisions of sections 32(s) and 30 of the Workmen's Compensation Act (Acts 1918, ch. 400, section 30, as amended by Acts 1930, ch. 54, and section 32(s), as added by Acts 1930, ch. 54); the payments beginning August 19, 1933. The initial hearing was held before Chairman Kizer and an award was rendered on October 8, 1934. On a review, the full commission affirmed the findings of fact of October 8, 1934 and the award then made. This was on November 14, 1934. An appeal from the findings of the commission was allowed by this court.

The case grows out of an accident and consequent injuries to Robert H. Forrest, who was under twenty-one years of age, while he was an enlisted member of the Virginia National Guard, and, as such, in attendance upon the annual encampment of his military organization, Battery "D," 111th Field Artillery, at Virginia Beach for two weeks during the month of August, 1933.

On the night of August 19, 1933, Forrest was given a

pass to leave the military reservation and visit the adjacent town of Virginia Beach. He left the reservation in the company of other soldiers at about 7:30 in the evening and visited a number of places of amusement at Virginia Beach.

While at Virginia Beach, he met Corporal Gillen and Private Phillips, both members of his battery, and they remained together for a portion of the evening. At about 10 p. m., these three men met Lieutenant Tennis, an officer of their organization, then engaged in military police duty, by order of military authority. Lieutenant Tennis observed that the two men were under the influence of intoxicants, whereupon he ordered Corporal Gillen to return to camp and after satisfying himself that Private Forrest was sober, he ordered him to take Phillips back to camp. Recognizing this order, and pursuant thereto, Forrest began its execution by starting with Phillips toward the camp and Corporal Gillen accompanied them. *En route* Phillips and Gillen went into a place of entertainment, called, "The Three Musketeers," while Forrest waited for them on the outside.

Corporal Gillen and Private Phillips then came out and Forrest proceeded with Phillips toward the camp, Gillen accompanying them. They had gone a few blocks in the direction of the camp when Phillips turned into a side street and Forrest followed him. Phillips went down the side street for about a block and sat down upon a railroad track. Forrest undertook to persuade Phillips to go on with him to camp, but this was unavailing. Forrest then sat down beside him on the track, which he thought was a spur track leading into the camp, and waited until he thought Phillips' condition was such that he could be induced to return with him to camp. While they were sitting there, Forrest observed the approach of an electric car some distance off. He tried to arouse Phillips but without avail. He then got off the track, himself, and went in front of Phillips and tried to pull him off the rails. He was unable to accomplish this and he got in such a

position between the tracks as to be able to grasp Phillips under his armpits and lift him from the rail, but in doing this, Forrest's foot slipped and he fell with his feet extending across the rail where they were run over by the oncoming electric car, which necessitated their amputation. This narrative is in accordance with the testimony of the claimant and his witnesses and the findings of fact by the commission, which testimony, however, is in conflict with that of the motorman operating the car.

The contention of the appellant, who is the insurance carrier is that the accident did not arise out of and in the course of the claimant's employment, but that it was the result of misconduct on the part of the claimant which bars him from the allowance of compensation under section 14 of the act (Acts 1918, ch. 400).

As to the first contention, the carrier urges that, when the claimant was given a pass to leave the military reservation for Virginia Beach and proceeded to avail himself of its privileges, there was a cessation of the relation of master and servant between himself and the State of Virginia, his employer.

If this case involved ordinary civil employment, this position might or might not be sound, depending upon the circumstances of the particular case.

But here is an instance of an enlisted soldier in the military service of the State and called to perform active duty for a specific period of time under the orders of constituted military authority. This period of the relationship referred to began on August 3, 1933, and continued for two succeeding weeks which included the time when the claimant was at Virginia Beach on the temporary leave issued to him.

We cannot agree that this constituted a severance of the relation of master and servant.

As is pointed out in the claimant's brief, his contract of service with his employer, is to be found in his enlistment record which contains his declaration as to its terms and conditions and his oath of enlistment.

The pertinent parts of these are as follows:

1. "Having been fully informed of the nature and terms of this enlistment contract, the length of the term of service, the amount of pay and other allowances, and the contract having been read to me before being signed by me, and being thoroughly understood by me, I do make the following declaration:"

"I do hereby acknowledge to have voluntarily enlisted * * * as a soldier in the National Guard of the United States and of the State of Virginia * * * under the conditions prescribed by law unless sooner discharged by proper authority; * * * that I will obey the orders * * * of the Governor of the State of Virginia, and of the officers appointed over me according to law and the rules and Articles of War."

■ We are quite in agreement with the position of the claimant as expressed by this paragraph from his brief:

"By virtue of the contract of employment it is submitted that the relationship of master and servant was continuous from the moment when Forrest reported at Hampton, Virginia, in compliance with the orders from his employer, the State of Virginia, until he was released from active employment by the termination of said orders, unless he was sooner discharged by proper authority or by the expiration of the period for which he (actively) enlisted. The relationship of master and servant was not broken when Forrest went to Virginia Beach on pass. This pass, or temporary leave of absence from his duties at the camp, was nothing more than a permission for him to absent himself for a few hours for recreation. During this period his employment continued for the reason that he was still in the character of a soldier and never dropped this character for one minute."

And further:

"When he is permitted time away from the place of encampment, he is nevertheless an employee because he is a full-time soldier and is being paid for the full period of the two weeks, and not for two weeks less such time as

he may be on pass. When he is on pass or temporary leave of absence, he has no control over his movements except such as maybe specially permitted."

The enlisted soldier, during his enlistment, and particularly during the active specific period of duty, never doffs the habiliments of his profession, to the extent of being beyond military orders and control. A pass granting temporary leave for recreational purposes cannot change this status any more than a leopard can change its spots. It would be *dehors* the principles of military science if it were otherwise.

The National Guard has come in time to be a vital military unit and is accounted so by the War Department of this country. If a temporary leave were held to be a severance of the status of its members, with license to follow their own inclinations and do as they might please, the *esprit de corps* would be shattered to the vanishing point. There would be no such thing as a dependent and reliable *morale*.

It is interesting and of moment to note the holdings of the Judge Advocate General of the Army, in the digest of opinions, 1912-1930, under the heading, "Line of Duty":

423. A soldier, on pass, spent the evening in a neighboring town drinking with companions, and refused to accompany them back to the post when they left about 2 a. m. Next morning his body was discovered on a railroad track. He apparently had been dead for some time. The actual circumstances of death were not ascertainable. The board found that the soldier "had been under the influence of liquor immediately prior to his death, but not to the extent that he could not exercise ordinary judgment or control of his conduct" and that death occurred *in line of duty and not as a result of his own wilful misconduct*. Held: That as the evidence adduced before the board that the deceased was under the influence of intoxicating liquor, is not preponderating and as the board had the opportunity to observe and take into consideration the character of the witnesses and all the circumstances of the

case, and its proceedings have received the approval of the reviewing authority, there appears to be no legal reason for now disturbing its findings. The case involves a doubt that should be resolved in the soldier's favor and death should be regarded as having been incurred in line of duty. 220.46 April 20, 1929.

443. The death of a soldier, absent from camp on a pass, occurred while trespassing upon a railroad track, without any evidence to show why he went upon the tracks. The only evidence of military orders against walking upon the track was the testimony of a lieutenant that he had "cautioned the soldier about possible danger resulting from walking on such tracks" which is insufficient to support a conclusion of knowingly violating a military order in regard thereto. Under such circumstances, the mere trespass in technical violation of civil law should not be considered conclusive of whether the soldier's death occurred in line of duty. Negligence cannot be presumed in the absence of any evidence as to why the soldier was on the tracks. The death of this soldier should be regarded as having occurred in line of duty and not through wilful misconduct. 220.46 August 2, 1919.

In the light of our view as already disclosed it is unnecessary to discuss the effect of the order of Lieutenant Tennis to Forrest to take Phillips back to the camp. Forrest's immediate obedience to the command of his superior officer but emphasises the continuity of the relation of master and servant.

If it could be conceived that heretofore such relationship had been severed, undoubtedly the effect of the order would be to rehabilitate it.

But, as we have said, it is our judgment, that the relationship, in legal contemplation was never interrupted.

It is interesting to note the observations of the Encyclopaedia Britannica, volume 23, page 322, in its article on war, under the heading, "The Army as an Organism":

"The source of discipline is the common life. The recruit finds himself living in a society, the regiment, per-

vaded by an order which in course of time shapes his bearing and enters into his consciousness.

\* \* \* \* \* \* \* \* \* \*

"The sanction of discipline is military law, a draconic code, which in war exacts the penalty of death for disobedience, for cowardice and for lack of vigilance. The military code, like the criminal code in civil life, seldom needs to be put into execution. It forms a background, a last resort, and fulfils its purpose because all concerned know that it is there."

The record does not justify the contention that misconduct on the part of the claimant prevented his recovery.

The carrier admitted its failure to sustain the charge of the intoxication of the claimant. The admission of the claimant that he might have nodded while he was sitting on the railway track before the accident occurred is emphasized by the carrier as showing such misconduct upon the part of the claimant as to preclude his recovery under section 14 of the act. This could be regarded as nothing more than negligence which is without the legal effect ascribed to it.

The carrier has cited a number of cases from this and other courts, which, we think, are not applicable to this case, in the light of the view we have taken.

We think that the evidence is quite sufficient to support the findings of fact and conclusions of law of the commission.

*Affirmed.*

HUDGINS, J., concurring.