**UNITED STATES v. STANDARD OIL CO. OF CALIFORNIA et al.**

Civil Action No. 4204–Y.

District Court, S. D. California, Central Division.

May 18, 1945.

808

Charles H. Carr, U. S. Atty., and Ronald Walker and Cameron L. Lillie, Asst. U. S. Attys., all of Los Angeles, Cal., for plaintiff.

Jennings & Belcher by Frank B. Belcher, all of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

At six-thirty A. M. on the 7th day of February, 1944, John Etzel, an enlisted man in the Armed Forces of the United States Government, was crossing Figueroa Street in the City of Los Angeles, on the south side of Eighth Street. Before stepping down from the curb to the pavement, *he looked north and saw a semi-trailer oil truck,* belonging to the defendant Standard Oil Company of California, and then driven by one of its employees, the co-defendant Ira Boone. The truck was at a distance of some seventy-five feet from the intersection. It was early in the morning and still dark. The automatic traffic signals were not operating. Etzel stepped into the street and crossed easterly, at all times remaining within the confines of the marked pedestrian zone.

Figueroa Street is fifty-six feet wide at that intersection. At a distance of about twenty-four feet from the curb, Etzel was hit by the truck. It is not clear what portion of the truck hit him. But from the fact that he had a large gash on the side of his head, the inference is justified that he came in contact with the right side of the truck, and that the head injury was caused by the handle of the door. He was

thrown to the ground. In addition to the injury to his head, Etzel suffered injuries to his face and left thigh and had contusions, lacerations and abrasions over his entire body. He was hospitalized and was unable to perform his tasks as a soldier for twenty-nine days.

By this action, the Government seeks to recover the sum of $192.56. Of this sum, $123.25 is the cost of Etzel's hospitalization. As to this amount, there is a stipulation that it is the fair and reasonable value of the hospital care necessarily required for Etzel as a result of the injuries suffered. While the stipulation does not concede the necessity for the hospitalization, this fact flows from the obligation of the Government to care for persons in the military service, both under Congressional enactments and Army regulations.[1] The sum of $69.31 represents the wages paid to Etzel while he was incapacitated. There is no stipulation as to, or proof of, the reasonableness of the amount so paid. But, as the pay of enlisted men is fixed by Section 9 of the Pay Readjustment Act of June 16, 1942,[2] it must be assumed that the wages decreed by the Congress are reasonable.

And disability does not relieve the Government of the obligation to pay the wages prescribed.

We have to determine whether the Government is entitled to recover.

The defendants have challenged this right upon several grounds.

First, we must answer the question whether the Government of the United States has the right to sue for the cost of hospitalization of, and wages paid to, a soldier during the time he was incapacitated, through the tortious act of another. There are no precedents controlling. Strange as it may seem, the question has not arisen in peace time or during any of the wars in which large numbers of men were in the active service of the Armed Forces of the United States. There are state court decisions dealing with the status of persons enlisted in the state militia. They do not help. They concerned attempts of persons injured while in the militia to recover under State Workmen's Compensation Acts. The rulings are both ways. Some cases deny the right to recover upon the ground that a person while an active member of a state militia is not an employee.[3] Other cases decide the contrary.[4] Neither group is very persuasive on the question before us.

Workmen's compensation is based upon a theory which places responsibility for injuries upon industry regardless of fault. When applying this doctrine, the inclusion of any person within the beneficiary groups reflects largely the approach of the court to the problem and the range of its interpretation of a specific enactment. A narrow approach restricts the group, while a broad one, having in view the beneficial social aims to be achieved, enlarges it.[5] However, we are not without signposts to guide us in determining the question. And we can do so without adopting the strict theory of master and servant which the Government asserts. For, ultimately, we are confronted with the fact that courts now take a less circumscribed view of the relation than they did in the past. The trend is to hold that almost any association in which a person is subject to the control of another may be considered as a master-servant relation. Courts apply to it, especially when dealing with the harm which third persons may do to it, the rules of liability which would flow from a strict relation of master and servant.[6] At the common law, the master could recover for loss of services resulting from a tort com-

---

[1] 54 Stat. 885, 50 U.S.C.A.Appendix, § 303(d); Army Regulation 40-505, Sec. 2.

[2] 54 Stat. 886, 50 U.S.C.A.Appendix, § 303(d). And see: 55 Stat. 800, 10 U.S.C.A. § 2; 56 Stat. 363, 37 U.S.C.A. § 109.

[3] Hayes v. Illinois Terminal Transportation Co., 1936, 363 Ill. 397, 2 N.E.2d 309; Goldstein v. State, 1938, 281 N.Y. 396, 24 N.E.2d 97, 129 A.L.R. 905; Lind v. Nebraska National Guard, 1944, 144 Neb. 122, 12 N.W.2d 652, 150 A.L.R. 1449.

[4] State v. Industrial Commission, 1925, 186 Wis. 1, 202 N.W. 191; Baker v. State, 1931, 200 N.C. 232, 156 S.E. 917, 919; Globe Indemnity Co. v. Forrest, 1935, 165 Va. 267, 182 S.E. 215; Andrews v. State, 1939, 53 Ariz. 475, 90 P.2d 995.

[5] See my opinions in Didier v. Crescent Wharf & Warehouse Co., 1936, D.C.Cal., 15 F.Supp. 91, 93-94; Trudenich v. Marshall, 1940, D.C.Wash., 34 F.Supp. 486, 487.

[6] Darmour Productions Corporation v. Herbert M. Baruch Corporation, 1933, 135 Cal.App. 351, 27 P.2d 664.

mitted on the servant of a third person.[7] By analogy, a parent was given the right to recover for loss of the services of his child,[8] and a husband for those of his wife.[9] And these actions are entirely independent of the right of the servant, child, or wife to recover for the injuries themselves.[10]

When a man becomes a soldier, a status is created whether the soldier enlists voluntarily or is selected under a Selective Service law.[11] A voluntary enlistment originates in a contract for a definite period. But there any similarity between it and other contractual relationships, such as master and servant, ceases. The essence of the relation of master and servant is the freedom of the servant to end it, subject, of course, to responsibility for wrongful termination. But even a volunteer cannot withdraw from the army during the period of enlistment. Wrongful ending or even long, unexcused absence, is punishable as a crime both in peace and in war time.[12] The obligations which the Government assumes towards a soldier are more legislative than contractual. The Congress of the United States, in the exercise of its war powers, has either defined those obligations or allowed the army establishment to decree them pursuant to a defined congressional policy. In time of emergency, or war, the distinction between the volunteer and the draftee disappears. The aim of the Congress has been to apply all the rules ordained for the comparatively small army maintained in time of peace to the large citizens' army called up by the Selective Service and Training Act of 1940 and its later amendments.[13] So the upshot of the matter is this: A special relation has been created. Whether we call it a status, as some of the older cases do, or whether we just call it Government and soldier relation, it is clear that both the soldier and the Government have certain rights and obligations arising from it and that a third party who, through his tortious act, interferes with it to the detriment of the Government, is responsible for the mischief he causes. And he cannot avoid responsibility for his act by claiming that the relation is one for which the common law *did not have a name*. The relation is an actuality. And in the light of the modern trend to protect individuals and categories from outside tortious or even non-tortious interference,[14] the Government, which, *through the negligent act of a third party*, is put to the expense of hospitalizing a soldier and loses his services during a period for which it is compelled to pay him his wages, has a claim cognizable in this court.

An English case which arose during the last war sustains these views. The English Crown sought to recover for medical expenses, hospital treatment and wages of two air craftsmen of the Royal Air Force, who had been injured in a collision. The Crown's right to recover was sustained in these words:

"As regards the claim in respect of wages, it is essentially a claim based upon the old common law principle that a master who has, by the tortious act of a third person, been deprived of the services of his servant may claim damages in respect of that deprivation against the third person who has brought it about. There is not, I think, any doubt that a right of action by a master for the loss of the services of his servant exists and has been recog-

---

[7] 18 R.C.L. 542; Holdsworth, History English Law, 1922, 3rd Ed. Vol. 8, p. 429; Adm. Commissioners v. S. S. Amerika, (1917) A.C. 38, 44–49 (per Lord Parker), 53–54 (per Lord Sumner); Attorney General v. Valle-Jones, (1935) 2 K.B. 209.

[8] Restatement of Torts, Sec. 703; 20 R.C.L. 614–616.

[9] Restatement of Torts, Sec. 693; 41 C.J.S., Husband and Wife, § 401; Lansburgh & Bro. Inc. v. Clark, 1942, 75 U.S. App.D.C. 339, 127 F.2d 331.

[10] 20 R.C.L. 615, 616; Lansburgh & Bro., Inc. v. Clark, 1942, 75 U.S.App.D.C. 339, 127 F.2d 331. And see cases cited in Footnotes 7, 8, and 9.

[11] 6 C.J.S., Army and Navy, § 21; In re Grimley, 1890, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636: In re Morrissey, 1890, 137 U.S. 157, 11 S.Ct. 57, 34 L.Ed. 644; Selective Draft Law Cases (Arver v. United States), 1917, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann. Cas.1918B, 856; United States v. Williams, 1937, 302 U.S. 46, 58 S.Ct. 81, 82 L.Ed. 39; Falbo v. United States, 1944, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305; Billings v. Truesdell, 1944, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917; Local Draft Board No. 1 v. Connors, 1941, 9 Cir., 124 F.2d 388.

[12] See sections 1530 and 1533, 10 U.S. C.A. Articles 58 and 61 of Articles of War of the Armies of the United States.

[13] 50 U.S.C.A.Appendix, § 301 et seq.

[14] Restatement of Torts, Secs. 766–767; Original Ballet Russe v. Ballet Russe, 1943, 2 Cir., 133 F.2d 187.

nized from early times. Curiously enough it has perhaps been kept in activity most frequently as the fictitious basis, and the only basis, for the action of seduction by which the seducer of a woman or girl may be made to pay the penalty of his wrongdoing. The Solicitor General referred me to several cases based upon that principle, beginning with Hall v. Hollander, [4 B & C 660] in 1825, and perhaps most noticeably exemplified in Evans v. Walton [L. R. 2 C.P. 615]. It is well settled that when by the tort of a third party a master has lost the services of his servant he can recover damages in respect of that loss of service. The amount of his damages is, of course, dependent upon the facts of the particular case. If he has got a substitute to do the work of the servant, his damages may be the extra cost to which he has been put over and above the payment he makes to the servant who is incapacitated. If he has put an end temporarily to the contract of service of the injured servant and pays him nothing, his damages would be the amount, if any, that he has to pay to the substitute. The payment, if any, that he makes to the substitute may of course be equal to, more than or less than the wage of the injured servant. On the other hand, where he does not employ a substitute, if he continues to pay the wages to the injured servant, he clearly loses any benefit arising from that payment, because he is getting nothing in return for it. In that case, therefore, his damages are, prima facie, the amount of the wages that he has thus paid for nothing. *This case is of that last mentioned class, and the damages claimed on behalf of His Majesty are the amount of the wages paid to these men during their incapacity.* There is no evidence to show that while these men were in fact being paid during their incapacity any extra men were recruited to take their place, or that any payment was made to any other person for doing their work. Therefore, prima facie, *damage has been suffered to the extent of the wages thus paid to them for nothing.* So much for the claim in respect of wages.

"As regards medical expenses and hospital treatment, the claim for damages for these expenses is even more simple. It is put upon the ground that the Crown, having in fact expended the amount claimed under this head, ought to be compensated for these expenses by the person responsible for the negligence which rendered them necessary.

"That being the claim which His Majesty would prima facie be entitled to make, the suggested answer is that it is simply a claim by a master for damages for loss of his servant's services and incidental expenses, and that it must be treated and decided on the common law principles applicable to that relationship." [15] (Emphasis added)

It is apparent that the case was decided upon the assumption that the rules of master and servant apply. However, as already indicated, the conclusion must be the same, even if we take into account the dissimilarity between the Government and soldier inter-relation and that between master and servant. For, after making due allowance for the differences, we still have a cohesive pact which, like the pactum subjectionis—the pact between king and subject in mediaeval Europe—ties the soldier to the Government, at the same time reserving to each rights and obligations which flow from their union. Or we might apply to it the word which French jurists have coined to characterize certain solidarities which lie at the basis of social action—*institution*. Such *institution* gives rise to droit institutionnel, a body of rights arising from the communality of the group, such as the family, in which each member exercises certain rights and has obligations not as an individual, but as a member of the *institution*, according to the position he occupies—suam cuique dignitatem. These rights or obligations stem, not from the members as individuals (in the case of the family, parents or children), but from the basic fact which brought it into being, (in the case of the family, marriage).[16]

So, if we bear in mind the wise saying of a French jurist that there is a greater

---

[15] Attorney General v. Valle-Jones, (1935) 2 K.B. 216, 217.

[16] Georges Renard: La Valeur de la Loi, 1928, pp. 244–248; Maurice Hauriou: 1927, p. 206; François Gény: Science et

technique en droit positif privé, 1924, IV, pp. 119–125, 153. And see: Charles Grove Haines, Revival of Natural Law Concepts, 1930; Leon R. Yankwich, Back to St. Thomas, 1930, II Opinion No. IV, p. 6.

logic than the logic of concepts—the logic of life and of reality [17]—the conclusion is inescapable that the foundational fact of enlistment, whether voluntary or forced, is the bond (vinculum) which brings into being the Government and soldier *institution*. To the *institution* so born, and to the Government and soldier, as members of it, certain rights attach. And the most fundamental one is that others shall not, *by their wrongful action*, interfere with it to the harm of the Government.

Rightly. For the Government, after the *institution* comes into being, assumes a primacy and control over the actions of the other member, the soldier, which is greater than that of the master, husband or father. Hence, whether we approach the problem with the common law norms in view or on the more latitudinarian basis of social actualities, we are compelled to sustain the Government's right to institute this action.[18] Granted the right to sue, recovery is still dependent on proof of the negligence of the driver, and the absence of contributory negligence on the part of the soldier. It is almost beyond dispute that the driver of the truck was negligent. He testified to seeing Etzel inside the cross walk. He failed to yield to him the right of way, in violation of the California Vehicle Code.[19] This was an act of negligence on the part of an employee for which the employer, Standard Oil Company of California, is liable.[20] The driver pleaded guilty to violation of the Vehicle Code and was fined in the Municipal Court of Los Angeles. This plea was admitted into evidence against him

only. As an admission of negligence, after the event, it was not binding on the employer. At the oral argument, I pressed the question whether Etzel was guilty of contributory negligence. A review of the facts in the light of the law of California, which governs, leads me to the conclusion that there was no contributory negligence.

The contributory negligence which bars recovery must be a cooperating cause.[21] It appears from Etzel's testimony and that of a disinterested witness who was standing on the curb, that Etzel looked north before stepping into the cross walk. He saw the truck at a distance which made it certain that the driver of the truck would see him and yield to his superior right to cross in a marked cross walk. Had the driver taken ordinary precautions, the distance was sufficient to have allowed Etzel to pass unharmed. The driver testified that he saw Etzel; that, at the time, Etzel was not looking in his direction, but that he thought he would look up in time to see the truck coming. He did not stop his truck or swerve it from its path until it was actually upon Etzel. Having *once looked* in the direction from which danger was coming and ascertained the position of the truck, *Etzel was not bound to continue looking to the north and to the south*. Even if he had miscalculated the distance, he could not be charged with contributory negligence. And the fact that he may have looked in the opposite direction before reaching the center of Figueroa Street, in order to see if automobiles were approaching from that direction, *if it was a fault*, was not a negligent act cooperating or con-

---

[17] Emile Boutroux, La Conscience individuelle et la loi, Révue methaphysique et de morale, 1906, p. 14.

[18] This case illustrates the difficulty which we encounter when we try to squeeze social activities into specific legalistic rubrics such as status, contract, quasi-contract, and the like. Even Sir Henry Maine's famous apothegm, "The movement of the progessive societies has hitherto been a movement from Status to Contract" (Sir Henry Maine, Ancient Law, Pollock Ed., 1930, p. 182), is no longer accepted by legal scholars as the true index of social progress or progress in law. See: Wm. Seagle, The Quest of Law, 1941, p. 252–265.

Sorokin has pointed out that while there have always been certain fundamental types of social relationships or systems of inter-action, they have not remained the

same, but have undergone many changes. He, himself, after naming three types— *familistic, contractual* and *compulsory*— teaches that in the unfoldment of Western culture, institutions may partake of all three with emphasis now on one and then on another. Pitirim Sorokin, Social and Cultural Dynamics, 1937, Vol. 3, pp. 23–43.

It is, therefore, unrealistic to shut our eyes to actualities merely because they do not fit into accepted legal concepts.

[19] California Vehicle Code, § 560(a), St. 1935, p. 188.

[20] California Vehicle Code, § 402(a), St. 1937, p. 2353.

[21] Restatement of Torts, Secs. 463–465; Rush v. Lagomarsino, 1925, 196 Cal. 308, 314, 237 P. 1066; Soares v. Barson, 1936, 12 Cal.App.2d 582, 585, 586, 55 P.2d 1283.

tributing to the injury. As said by the Supreme Court of California:

"Respondent testified that before she attempted to cross the street she looked to her left and saw the truck at a distance of approximately 125 feet away, and she calculated she could cross to the street car in safety. We think she had a right to assume that an observance of laws and a reasonable regard for the safety of others on the part of the driver of the truck would not require that *she should keep a constant eye upon him under the circumstances of the case.* He could have seen her hurrying for the car, as did others, and it was his primary duty to have done so." [22] (Emphasis added)

The truth is, as the driver admitted, he gambled on the chance that Etzel would stop in the cross walk, allow him to pass and yield the right of way *to him.* But he had no right to expect that, *because the law required him to yield.* So we have the not uncommon case of a driver taking the risk of missing a pedestrian, and, unfortunately, *not missing.*

 One more contention remains to be dealt with. On March 16, 1944, Etzel settled his claim against the two defendants for the sum of $300.00. He executed a "release in full" which stated, among other things, "I hereby release and discharge Standard Oil Company of California and Ira Boone of and from any and all claims and demands which I now have or may hereafter have," on account of the accident. It is argued that this settlement precludes recovery by the Government. We do not agree. It is true that a single claim for personal injuries cannot be split, and that a release operates as a satisfaction of whatever claims could have been asserted.[23] But these limitations apply only to the claims which the person executing the release has. They *do not* apply to a claim arising from the same accident which another person may have, *independent of the injured person,* because of his relationship to him. The cases already cited make it clear that in a case of this character, the two causes of action co-exist and are independent of each other.[24] And as Etzel incurred no loss through hospitalization, and the wages for the period *had to be, and actually were, paid to him by the Government,* the settlement of his claim was limited to compensation to him for his suffering, consequent upon his physical injuries.[25]

Judgment will, therefore, be for the plaintiff.

---

[22] McQuigg v. Childs, 1931, 213 Cal. 661, 664, 3 P.2d 309, 310. And see: Burgesser v. Bullock's, 1923, 190 Cal. 673, 214 P. 649; White v. Davis, 1930, 103 Cal.App. 531, 541–543, 284 P. 1086; Maggart v. Bell, 1931, 116 Cal.App. 306, 310, 311, 2 P.2d 516; Lincoln v. Williams, 1932, 119 Cal.App. 498, 502, 6 P.2d 563; Pinello v. Taylor, 1933, 128 Cal.App. 508, 513; 17 P.2d 1039; Salomon v. Meyer, 1934, 1 Cal.2d 11, 15, 16, 32 P.2d 631; Nicholas v. Leslie, 1935, 7 Cal.App.2d 590, 595, 596, 46 P.2d 761; Lowell v. Harris, 1937, 24 Cal.App.2d 70, 84, 74 P.2d 551; Vanderpool v. Dunham, 1939, 35 Cal.App.2d 166, 94 P.2d 1023.

[23] Kidd v. Hillman, 1936, 14 Cal.App. 2d 507, 58 P.2d 662; Franklin v. Franklin, 1945, 67 Cal.App.2d —, 155 P.2d 637.

[24] See cases cited under Footnotes 7, 8 and 9; 41 C.J.S., Husband and Wife, § 401, p. 896. And see: Lansburgh & Bro., Inc. v. Clark, 1944, 75 U.S.App.D.C. 339, 127 F.2d 331, 332, where Groner, C. J., says: *"In the prosecution of these separate and independent rights there is no privity,* and a judgment against one is not a bar to an action by the other." (Emphasis added)

[25] The identical contention was rejected in Attorney General v. Valle-Jones, (1935) 2 K.B. 209, 215. The Court said:

"As the result of that negligence, the injured men had a claim against the defendant for damages, which in the ordinary case would include any loss of wages during their incapacity and also the cost of any hospital treatment and medical attendance reasonably incurred. The injured men did make a claim against the defendant in which they recovered damages, but those damages cannot have included any sum in respect of loss of earnings, because in fact during the period of their incapacity they continued to receive their pay from their employers, the Royal Air Force; nor did those damages include any expenses of hospital treatment or medical attendance, because these benefits were provided for the men by the Royal Air Force."